UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Joseph A. Dickson |
| | : | |
| v. | : | |
| | : | Mag. No. 20-8481 |
| CARMELO G. GARCIA, | : | |
| FRANK VALVANO, JR., and | : | |
| IRWIN SABLOSKY | : | **CRIMINAL COMPLAINT** |

I, Michael Biondo, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Special Agent for the Federal Bureau of Investigation, and that this complaint is based on the following facts:

**SEE ATTACHMENT B**

Continued on the attached pages and made a part hereof:

_Michael Biondo_
Michael Biondo
Special Agent
Federal Bureau of Investigation

*Agent Biondo attested to this Complaint by telephone pursuant to FRCP 4.1(b)(2)(A).

Sworn to and subscribed via telephone,
This 19th day of November, 2020

Essex County, New Jersey
County and State

Joseph A. Dickson, USMJ
Signature of Judicial Officer

HONORABLE JOSEPH A. DICKSON
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

From at least in or about 2017 through in or about April 2019, in the District of New Jersey, and elsewhere, defendants

CARMELO G. GARCIA,
FRANK VALVANO, JR., and
IRWIN SABLOSKY

knowingly and intentionally did conspire and agree with each other and others to corruptly give and accept payments of $5,000 and more for the benefit of defendant GARCIA, an agent of the Newark Community Economic Development Corporation (the "NCEDC") and of the City of Newark, to influence and reward him, in connection with a business, transaction, and series of transactions of the NCEDC and the City of Newark involving $5,000 and more, contrary to Title 18, United States Code, Section 666.

In violation of Title 18, United States Code, Section 371.

1

## ATTACHMENT B

I, Michael Biondo, a Special Agent with the Federal Bureau of Investigation ("FBI"), having personally participated in the investigation of the conduct of defendants CARMELO G. GARCIA ("defendant GARCIA"), FRANK VALVANO, JR. ("defendant VALVANO"), IRWIN B SABLOSKY ("defendant SABLOSKY"), and others, which principally has included a review of text message communications of defendant GARCIA, defendant VALVANO, defendant SABLOSKY, and others, and recordings of defendant GARCIA obtained through consensual monitoring of communications; interviews of witnesses (including witnesses cooperating with law enforcement in this investigation); and a review of documents, records, and information obtained through court order or other process or methods, and having spoken with other law enforcement officers and individuals, have knowledge of the following facts. Because this Complaint is submitted for the limited purpose of establishing probable cause, I have not included all facts known to me concerning this investigation. The contents of documents, and the actions, statements, and conversations of individuals referenced below, are provided in substance and in part, unless otherwise indicated. Conversations and communications where speakers are quoted herein were provided to law enforcement by consent of one of the parties to those conversations or communications.

## RELEVANT INDIVIDUALS AND ENTITIES

1.    At times relevant to this Criminal Complaint:

      a.    Defendant GARCIA was the Executive Vice President and Chief Real Estate Officer of the Newark Community Economic Development Corporation (the "NCEDC") from in or about 2015 to at least in or about April 2018, according to NCEDC payroll records. Defendant GARCIA also served as Deputy Mayor for the City of Newark, New Jersey ("Newark"), and as Acting Director of the Newark Department of Economic and Housing Development ("EHD Department"), from in or about September 2017 to in or about August 2018. After leaving his position as Deputy Mayor, defendant GARCIA continued to work for Newark, including as Chief of Development for the EHD Department, until in or about April 2019. Defendant GARCIA also served as the Executive Director of the Irvington Housing Authority starting in or about June 2017. After leaving Newark government in or about April 2019, defendant GARICA became the "manager" of a "consulting" company.

      b.    Newark government received well over $10,000 in benefits per year since on or about January 1, 2016, under Federal programs involving grants and other forms of Federal assistance, to include funds from programs administered by the Community Planning and Development Division of the U.S. Department of Housing and Urban Development. One such program was the Community Development Block Grant ("CDBG"), whose purpose was to develop viable urban communities by providing decent housing and a suitable living environment and by expanding

2

economic opportunities, principally for low- and moderate-income persons. Between on or about January 12, 2016, and on or about December 29, 2016, Newark received well over $7 million in CDBG funds. Between on or about January 24, 2017, and on or about December 19, 2017, Newark received over $5 million in CDBG funds. Between on or about January 10, 2018, and on or about December 19, 2018, Newark received just under $6 million in CDBG funds. Between on or about February 4, 2019, and on or about December 23, 2019, Newark received just under $8 million in CDBG funds.

c.    The NCEDC was an Internal Revenue Code Section 501(c)(3) organization, whom the Newark Municipal Council (the "City Council") recognized as Newark's "Economic Development arm" and whose stated purpose was to retain, attract, and grow business, enhance small and minority business capacity, and spur real estate development within Newark. It had a Board of Directors, a President and Chief Executive Officer, and other officers. The NCEDC served as the lead developer and project manager on Newark development projects, in which capacity NCEDC received funds from Newark, including over $10,000 in Federal program benefits per year in 2016 and 2017.

d.    Defendant VALVANO and defendant SABLOSKY were co-owners of a New Jersey-based pawnbroker and jewelry business (the "Business"), which sold diamonds, watches, and other jewelry in-store and online. Several of the Business's retail locations also provided collateral loans and check cashing services. Defendant VALVANO and defendant SABLOSKY also pursued and were involved in redevelopment projects in Newark through various limited liability companies.

e.    There was an individual ("Individual 1"), who was involved in real estate deals in Newark through various limited liability companies and was an associate of defendant GARCIA.

f.    There was an individual ("Individual 2"), who was involved in a real estate investment venture with defendant VALVANO and defendant SABLOSKY from in or about early 2017 until in or about October 2019, for the purpose of acquiring and renovating or redeveloping residential and commercial properties, including various Newark-owned properties, in Newark.

3

## OVERVIEW OF THE CONSPIRACY

2.      Defendant GARCIA, defendant VALVANO, defendant SABLOSKY, and others agreed for defendant VALVANO, defendant SABLOSKY, and Individual 2 to pay defendant GARCIA significant money payments and other benefits, in exchange for defendant GARCIA's official assistance with securing Newark-approved redevelopment agreements ("RDAs") to purchase and redevelop Newark-owned properties, to include obtaining preliminary designated developer status, and to ensure that defendant GARCIA did not use his influence and authority to act against their interests.

3.      To conceal their corrupt activity, defendant GARCIA, defendant VALVANO, defendant SABLOSKY, and others referred to money that defendant GARCIA accepted as "butter," "docs," "pages," or "added pages." As part of the corrupt arrangement, in addition to money payments, defendant GARCIA also received jewelry, including several watches and chains, through defendant VALVANO and defendant SABLOSKY from the Business.

## EVIDENCE OF THE CONSPIRACY

*Defendant GARCIA, Defendant VALVANO, Defendant SABLOSKY, and Individual 2 Communicated with Each Other in Advance of Obtaining Preliminary Designated Developer Status and the Newark City Council's Approving RDAs for Defendant VALVANO and Defendant SABLOSKY's Entities to Purchase Newark-Owned Properties, and Arranged for Defendant GARCIA to Receive Money and a High-End Watch in Return for His Official Assistance.*

4.      Letters from the EHD Department dated in or about March and April 2017 and recovered during a September 2020 search of the Newark location of the Business, showed that defendant VALVANO of Saval Realty LLC ("Saval Realty") was awarded preliminary designated developer status in connection with several Newark-owned properties. Additionally, in or about July 2017, e-mail communications between defendant GARCIA, who at the time was the Executive Vice President and Chief Real Estate Officer of the NCEDC, and the EHD Department, Division of Property Management, showed that defendant GARCIA assisted with Newark's issuance of preliminary designated developer status to a number of entities, including Saval Realty, in connection with several Newark-owned properties. Documents recovered by law enforcement during September 2020 lawful searches of the Belleville, New Jersey, and Newark locations of the Business, included a December 2016 Saval Realty proposal for Newark-owned properties and an April 2018 Annual Report Certificate issued by the New Jersey Department of the Treasury, Division of Revenue and Enterprise Services, showing that defendant VALVANO and defendant SABLOSKY were the co-managing partners of Saval Realty. Once defendant VALVANO and defendant SABLOSKY obtained preliminary designated developer status for Newark-owned properties, including through Saval Realty, defendant VALVANO and SABLOSKY registered separate limited liability companies ("LLCs"), including 123-131 Riverside Urban Renewal LLC ("123-131 Riverside LLC") and 281 Passaic Street Urban Renewal LLC ("281 Passaic LLC"), to facilitate the purchase and redevelopment of related groups of properties in Newark, including those covered by the designations.

4

5.      On or about November 8, 2017, the City Council adopted a resolution approving an RDA with 123-131 Riverside LLC and authorizing the sale of several Newark-owned properties, along Riverside Avenue and McCarter Highway in the Newark's North Ward, to 123-131 Riverside LLC. Approximately five days later, on or about November 13, 2017, the City Council adopted a resolution approving a separate RDA with 281 Passaic LLC and authorized the sale of additional Newark-owned properties located in Newark's Central Ward, to 281 Passaic LLC. Defendant SABLOSKY was the registered agent for both entities, headquartered at the Newark location of the Business.

6.      Documents recovered during the September 2020 search of the Business's Newark location included a copy of an RDA between Newark and 123-131 Riverside LLC to redevelop the Newark-owned properties listed in the November 8, 2017 City Council resolution. The RDA was dated August 21, 2017, but appears, based on a handwritten notation on the signature page, to have been signed on or about January 30, 2018. Defendant GARCIA, in his capacity as Acting Deputy Mayor and Director of the EHD Department, and the Mayor of Newark signed the RDA on behalf of Newark, and defendant SABLOSKY signed the RDA on behalf of 123-131 Riverside LLC.

7.      Telephone records showed that, in the months leading up to Saval Realty's receipt of designated developer status and the November 2017 City Council resolutions approving the RDAs with 123-131 Riverside LLC and 281 Passaic LLC, defendant GARCIA, defendant VALVANO, and defendant SABLOSKY communicated with each other frequently. For example, between on or about January 4, 2017, and on or about November 13, 2017, defendant GARCIA communicated approximately 438 times with defendant VALVANO using one telephone, and between on or about March 3, 2017, and on or about July 18, 2017, defendant GARCIA communicated approximately 45 times with defendant VALVANO using another phone. In addition, between on or about June 27, 2017, and on or about October 27, 2017, defendant GARCIA communicated approximately 61 times with defendant SABLOSKY using one telephone, and between on or about March 2, 2017, and on or about October 2, 2017, defendant GARCIA communicated with defendant SABLOSKY approximately four times using another phone. Between on or about January 9, 2017, and on or about August 8, 2017, defendant GARCIA communicated with Individual 2 approximately 124 times using one telephone, and between on or about March 2, 2017, and on or about September 11, 2017, defendant GARCIA communicated with Individual 2 approximately 27 times using another phone.

8.      In the months leading up to the City Council's November 2017 adoption of the resolutions approving the RDAs relating to 123-131 Riverside LLC and 281 Passaic LLC, defendant VALVANO, defendant SABLOSKY, and Individual 2 provided a high-end watch and "docs," i.e., cash, to defendant GARCIA in exchange for his assistance in securing those RDAs. For example, records recovered during the search of the Belleville location of the Business showed that, on or about June 28, 2017, defendant VALVANO and defendant SABLOSKY provided defendant GARCIA with a high-end watch valued at approximately $7,500 from the Business. In addition, on or about July 31, 2017, defendant GARCIA and Individual 2 exchanged the following text messages:

5

Individual 2:        Please call me, or go see Irwin [defendant SABLOSKY] at his office and pickup docs.

Defendant GARCIA:  Hi . . . in a mtg with the Mayor so will call you back!  I'll stop by around 2:30pm

Defendant GARCIA:  Actually more like 3pm!

***Defendant GARCIA Accepted $25,000 in Cash from Defendant VALVANO, Defendant SABLOSKY, and Individual 2 in Exchange for Defendant GARCIA's Official Assistance in Securing Additional Newark-Owned Properties for Redevelopment, Including Obtaining Preliminary Designated Developer Status.***

9.      Following the November 2017 City Council resolutions and through in or about April 2019, defendant GARCIA, defendant VALVANO, defendant SABLOSKY, and Individual 2 continued to communicate with one another, including to arrange a June 14, 2018 meeting among defendant GARCIA, who by this time was the Deputy Mayor and Director of the EHD Department, defendant VALVANO, and Individual 2, during which meeting defendant GARCIA accepted a $25,000 cash payment from Individual 2, using cash supplied by defendant VALVANO.  Defendant VALVANO, defendant SABLOSKY, and Individual 2 provided the $25,000 cash payment in exchange for defendant GARCIA's official assistance in securing additional Newark-owned properties for redevelopment, including assistance with obtaining preliminary designated developer status.

10.     Telephone records show that on or about June 14, 2018, the day of the meeting, defendant GARCIA and defendant VALVANO communicated at least once.  In addition, defendant GARCIA and Individual 2 communicated over the phone approximately 21 times, including by text messages.  Specifically, defendant GARCIA and Individual 2 exchanged the following text messages to coordinate the timing and location of the $25,000 cash delivery to defendant GARCIA:

Defendant GARCIA:  Can you come down to [the Country Club in Westfield, New Jersey]?

Individual 2:        R u playing golf?

Defendant GARCIA:  I'm [at] an outing, but there are some folks I want you to meet!

Defendant GARCIA:  You can come in 30min or 1hour

Defendant GARCIA:  Or 2 hours!

Individual 2:        I'm going to call you in 5

Individual 2:        Brother call me

6

Defendant GARCIA:   Let's meet at 5pm there!!

Defendant GARCIA:   What time?

Individual 2:            We'll be there in 15

Individual 2:            [A restaurant in Mountainside, New Jersey (the "Restaurant")]

11.     At the Restaurant, according to Individual 2, defendant VALVANO provided Individual 2 an envelope containing $25,000 in cash for defendant GARCIA. When defendant GARCIA arrived at the Restaurant, he was carrying a gym bag and told Individual 2 to meet him in the bathroom. Once defendant GARCIA and Individual 2 were alone in the bathroom, defendant GARCIA set the gym bag on the floor in one of the bathroom stalls and then went over to the sink to wash his hands. Individual 2 entered the stall, placed the envelope with the $25,000 in cash in the gym bag, and left the bathroom. Defendant GARCIA then left the Restaurant bathroom carrying the gym bag with the $25,000 in cash inside. According to Individual 2, the $25,000 cash payment was in return for defendant GARCIA's official assistance with obtaining preliminary designated developer status from Newark for defendant VALVANO and defendant SABLOSKY's entities.

12.     Handwritten notes recovered during the September 2020 search by law enforcement of the Belleville location of the Business showed lists of figures under the letter "C," likely a veiled reference to defendant GARCIA using only the first initial of his first name, documenting money and jewelry that defendant GARCIA received from defendant VALVANO and defendant SABLOSKY. Several of the figures were annotated with a date or other notation. In particular, one entry under a "C" column dated "6/2018" was for "25000" and had the notation "FROM NWK." Based on the investigation to date, there is probable cause to believe that the entry related to the June 14, 2018 $25,000 cash payment that defendant GARCIA obtained and noted the source of the cash as the Newark location of the Business, owned by defendant VALVANO and defendant SABLOSKY. In addition, it should be noted that an entry next to the figure "7500" under the same "C" column stated in part, "watch on memo," likely referring to the watch provided to defendant GARCIA by defendant VALVANO and defendant SABLOSKY on or about June 28, 2017.

13.     Documents recovered during the September 2020 search by law enforcement of the Newark location of the Business also showed that, on or about June 19, 2018, approximately five days after defendant GARCIA received the $25,000 cash delivery, the EHD Department, the Director of which was defendant GARCIA at the time, granted preliminary designated developer status to Broad Development Group, LLC, and Heights Development Group, LLC, for certain Newark-owned properties. Defendant GARCIA was copied on the letter awarding the designated developer status, and his name was on the letterhead. Other documents recovered from the Newark location of the Business, including the Certificates of Formation issued by the New Jersey Division of Revenue and Enterprise Services to both entities, showed that defendant VALVANO and defendant SABLOSKY were the managing members of both entities.

***Defendant VALVANO, defendant SABLOSKY, and Individual 2 Complained About the Need to Keep Paying Defendant GARCIA and Individual 1 in Exchange for Defendant GARCIA's Official Assistance and to Ensure that Defendant GARCIA Did Not Act Against Their Interests.***

14.     Later in 2018, defendant VALVANO, defendant SABLOSKY, and Individual 2 complained about having to continue to pay defendant GARCIA for his assistance and expressing their concern that defendant GARCIA might not follow through on his end of the corrupt arrangement. For example, on or about October 25, 2018, Individual 2 communicated to defendant VALVANO and defendant SABLOSKY that defendant GARCIA might be "playing us all." Defendant VALVANO responded, "He [defendant GARCIA] can't take all the butter and [expletive] people. It would be a huge scandal," meaning that there would be consequences if defendant GARCIA accepted money and other benefits without fulfilling his end of the arrangement.

15.     Between on or about December 12, 2018, and on or about December 14, 2018, defendant VALVANO, defendant SABLOSKY, and Individual 2 exchanged text messages discussing plans for another meeting with defendant GARCIA at a restaurant in Harrison, New Jersey. On or about December 12, 2018, defendant VALVANO remarked that defendant GARCIA "should be getting hungry soon," which, according to Individual 2, referred to the fact that defendant GARCIA almost never paid for his own meals and expected defendant VALVANO, defendant SABLOSKY, and Individual 2 to pay his restaurant bills.

16.     On or about March 31, 2019, in text messages, defendant VALVANO and defendant SABLOSKY complained to each other and to Individual 2 that defendant GARCIA and Individual 1 were soliciting additional money payments and referred to prior payments of money and jewelry that defendant VALVANO and defendant SABLOSKY had already made to both defendant GARCIA and Individual 1:

| | |
|---|---|
| Defendant VALVANO: | [Individual 1] starting already looking for money! |
| Defendant SABLOSKY: | [Expletive] him |
| Defendant SABLOSKY: | We've been working ou[r] asses off what the [expletive] did he do for all this. |
| Defendant VALVANO: | I told him two months ago I will give him something in April because he would not stop hounding me. |
| Defendant SALBOSKY: | We've done nothing but spend tons of money and give away jewelry |
| Defendant SABLOSKY: | Tell him when we get some money we will give him. Carmelo [defendant GARCIA] wants more too. We can't afford it |

8

| | |
|---|---|
| Defendant VALVANO: | I've been telling him that for 2 months. And Carmelo should back the [expletive] off with all the [expletive] that is going on. Colossal balls |
| Defendant SABLOSKY: | We're a [expletive] money well for these guys to keep coming back to. We don't have it to keep giving to these freeloading [expletive]. |

17.     As alluded to above, during the conspiracy, defendant VALVANO and defendant SABLOSKY also provided money and jewelry to Individual 1, in part to appease defendant GARCIA, who had a close relationship with Individual 1. According to Individual 2, Individual 1 sometimes acted as an intermediary between defendant GARCIA and defendant VALVANO and defendant SABLOSKY. Handwritten notes recovered during the September 2020 search of the Belleville location of the Business also showed a second list of figures, on the same page as the list of figures under the letter "C," under the first initial of the first name of Individual 1, likely documenting money and jewelry provided by defendants VALVANO and SABLOSKY to Individual 1. For example, one entry dated "1/10/19" was for "8000" and had the notation "watch." Based on the investigation to date, it is likely that the entry showed that on or about January 10, 2019, defendants VALVANO and SABLOSKY provided a watch from the Business to Individual 1. Telephone records showed that, during the time period of the conspiracy, defendant GARCIA, defendant VALVANO, defendant SABLOSKY, and Individual 2 communicated with Individual 1 frequently.

***Defendant GARCIA Accepted an Additional $5,000 Payment in Exchange for His Official Assistance and to Ensure that Defendant GARCIA Did Not Act Against Defendant VALVANO's and Defendant SABLOSKY's Interests Involving Redevelopment Efforts with Newark.***

18.     Telephone records showed that defendant GARCIA, defendant VALVANO, defendant SABLOSKY, and Individual 2 continued to communicate regularly via telephone following the November 2017 City Council resolutions approving the RDAs with 123-131 Riverside LLC and 281 Passaic LLC and continuing through the first four months of 2019. For example, between on or about November 14, 2017, and on or about April 30, 2019, defendant GARCIA communicated approximately 177 times with defendant VALVANO using two different telephones, approximately 105 times with defendant SABLOSKY over those phones, and approximately 290 times with Individual 2 over those phones.

19.     On or about April 13, 2019, defendant VALVANO, defendant SABLOSKY, and Individual 2 communicated via text message about their ongoing efforts to obtain additional RDAs with Newark, about defendant GARCIA's role in those efforts, and about a meeting defendant GARCIA had with defendant SABLOSKY the previous day to discuss those efforts and to collect more money from defendant SABLOSKY. Defendant SABLOSKY also noted that defendant GARCIA was about to end his employment with Newark government and was planning to become a private "consultant." Those text messages are set forth herein:

9

Defendant VALVANO:     Did anybody hear from Carmelo [defendant GARCIA]?

Individual 2:     No, I tried calling him to no avail

Defendant SABLOSKY:     Sorry I was tied up th[i]s morning.  Oh yes he showed up [at] 5pm last night.  He wanted us to put 225 on the RDA I said 150 we then came up to 175.  He said they are much more cognizant of the values now.  I think we go with it and get the RDA in.

Defendant SABLOSKY:     He's done at the city as of Monday.  He's now a consultant.

Defendant VALVANO:     Ok.  Any mention of $$

Defendant SABLOSKY:     For him?

Defendant VALVANO:     Yes

Defendant SABLOSKY:     He didn't just come to visit!!  Lol.  He got another 5.  When you get back we have to add everything and sit down with him.  I want to get these RDAs through before we start rocking the boat.

20.     Based on the investigation to date, there is probable cause to believe that defendant SABLOSKY was informing defendant VALVANO and Individual 2 that defendant GARCIA had given defendant SABLOSKY advice on how defendant VALVANO, defendant SABLOSKY, and Individual 2 could obtain an additional RDA with Newark, namely, that defendant VALVANO, defendant SABLOSKY, and Individual 2 needed to offer to pay more money in order to acquire and redevelop the property in question.  Defendant SABLOSKY also informed defendant VALVANO and Individual 2 that the purpose of defendant GARCIA's visit was also to obtain additional money.  Based on the investigation to date, there is probable cause to believe that when defendant SABLOSKY said "He got another 5," he was informing defendant VALVANO and Individual 2 that he had provided defendant GARCIA with an additional $5,000 payment.

21.     Another entry under a "C" column of the handwritten notes seized from the Belleville location of the Business was dated "4/12/19" and was for "5000."  Based on the investigation to date, it is likely that the entry documented the April 12, 2019 payment of $5,000 that defendant GARCIA accepted from defendant SABLOSKY.  Additional entries under the same "C" column were what appeared to be monetary values corresponding to dates or pieces of jewelry, including high-end watches and chains.  At the bottom of the column was a horizontal line, followed by an entry for "156810," which likely represented $156,810, or the total approximate value of money and jewelry provided to defendant GARCIA by defendant VALVANO and defendant SABLOSKY in return for defendant GARCIA's official assistance in attempting to secure designated developer status and RDAs with Newark and to keep him from using his influence and authority to act against their interests.

10

***Defendant VALVANO's Statements to Law Enforcement.***

22.     On or about September 17, 2020, during a voluntary interview by law enforcement, defendant VALVANO denied that "docs" as used in Individual 2's July 31, 2017 text message was a reference to cash, but admitted that, when he asked whether "[defendant GARCIA] show[ed] up for docs last week" in a later October 1, 2019 text message exchange with defendant SABLOSKY and Individual 2, defendant VALVANO was asking whether defendant GARCIA, by that time a private "consultant," was asking for consulting fees. Defendant VALVANO also denied that the term "butter" was a reference to money, but admitted that, in a September 27, 2019 text message, when he asked "Why do we keep adding pages?" he was referring to defendant GARCIA's request for additional consulting fees. Despite the evidence to the contrary, defendant VALVANO also denied that, in or about June 2018, he provided $25,000 in cash to Individual 2 to give to defendant GARCIA, or that, in or about April 2019, defendant SABLOSKY provided an additional $5,000 to defendant GARCIA. He admitted that defendant VALVANO and defendant SABLOSKY took defendant GARCIA to lunch and paid for his meals and that, in or about 2017, the same year that defendant VALVANO and defendant SABLOSKY were pursuing the 123-131 Riverside LLC and 281 Passaic LLC RDAs, defendant VALVANO paid for defendant GARCIA's hotel room as a "thank you" during a trip defendant VALVANO took to Florida with defendant GARCIA, defendant SABLOSKY, and Individual 2. At first, defendant VALVANO described the trip as a "friends' trip" but later admitted that the trip was related to defendant VALVANO, defendant SABLOSKY, and Individual 2's real estate venture and redevelopment projects. Defendant VALVANO also admitted that he provided Individual 1 with watches and jewelry, but stated that those items were provided "on consignment," and that Individual 1 paid for some of them and still owed defendant VALVANO money on others. He also admitted to providing Individual 1 with money to expedite his and defendant SABLOSKY's redevelopment efforts. Defendant VALVANO further stated that defendant GARCIA frequently asked him for money to attend parties such as fundraisers, golf outings, and mayor's balls, which defendant VALVANO provided, often in the form of cash. According to defendant VALVANO, defendant GARCIA personally came to the Business to collect the money, which included various amounts of cash ranging from approximately $250 to $1,000.